DORE, Judge.
Plaintiff is seeking to recover damages for personal injuries as the result of an automobile collision between her automobile and a truck loaded with gravel and being driven by the defendant Jenkins, who at the time was hauling a load of gravel or sand from the plant of the Magnolia Sand and Gravel Company whose pit was located in Livingston Parish. The accident occurred on Florida Street in the City of Baton Rouge at about 11 o’clock A.M. at the junction of Florida Street and North Fourteenth Street. Plaintiff has joined in the suit James W. Carruth, owner of and doing business as Magnolia Sand & Gravel Company, and its insurer, Standard Accident Insurance Company.
The case was duly, tried and judgment rendered with written reasons in favor of the plaintiff and 'against the defendants, Jenkins, Carruth and Standard Accident Insurance Company, in solido, for $4,059.08, from which the defendant, Car-ruth and Standard Accident Insurance Company, have appealed. There was no *348 appeal by Jenkins. The plaintiff has answered the appeal in which she asked that the judgment be increased to the full amount claimed, although in their brief they suggest an increase of $9059.08.
The wreck and resulting liability of Jenkins is practically conceded by counsel for the defendant as they devote no time to this question in their, brief. In our opinion, the Jenkins testimony is not worthy of belief on this score, and his negligence and the utter lack of contributory negligence on the part of the plaintiff has been established not only by the plaintiff herself but by other witnesses who are disinterested and reliable. The statement of the District Court as to liability is correct, concise and in our entire accord and we quote:
“There is some dispute as to how the accident occurred, but in the opinion of this Court the evidence clearly indicates that Jenkins was grossly negligent, making a left-hand turn directly into the path of oncoming traffic. Furthermore, this Court is of the opinion that the plaintiff was free from contributory negligence. She was proceeding at a moderate rate of speed, keeping a proper lookout, and had a right to assume that the truck which was' slowly turning would respect her right of way and allow her to proceed across the intersection.' Instead of doing that, Jenkins cut to his left across the south half of Florida Street and struck plaintiff’s car, which was in the extreme south traffic lane.”
“Since the evidence overwhelmingly indicates that the cause of the accident was the gross negligence of the driver of the truck, the Court will not discuss this matter further.”
Defendants Carruth and the Insurance Company contend that Jenkins was an independent contractor and, therefore, they are not liable for his acts. There are innumerable cases dealing with this quest ion; however, it is concisely set forth and has been cited by the lower court in arriving at its decision, and also by counsel for the defendants in their brief, in 27 American Jurisprudence, page 485 to 488 under the subject “Independent Contractors” as follows:
“Although it is. apparent, from án examination of cases involving the independent contractor . relationship, that there is, no absolute rule for determining whether one is an independent contractor or an employee, and that each case must be determined on its own facts, nevertheless, there are many well-recognized and fairly typical indicia of the status of an independent contractor, even though the presence of one or more of such indicia in a case is not necessarily conclusive. It has been held that the test of what constitutes independent service lies in the control exercised, the decisive question being as to who has the right to direct what shall be done, and when and how it shall be done. It has also been held that commonly recognized tests of the independent contractor relationship, although not necessarily concurrent or each 'in itself controlling, are the existence of a contract for the performance by a person of a certain piece or kind of work at a fixed price, the independent nature of his business or his distinct calling, his employment.of assistants with the right to supervise their activities, his obligation to furnish necessary tools, supplies, and materials, his right to control the progress of the work except as to final results, the time for which the workman is employed, the methbd of payment, whether by time or by job, and whether the work is part of the regular business of the employer.”
“The most important test in determining whether a person employed to do certain work is an independent contractor or a mere servant is the control over the work which is .reserved by the' employer. Whether one is an independent contractor depends upon the extent to which he is, in fact, independent in performing the work. Broadly stated, if the contractor is under the control of the employer, he is a servant; if not under such control, he is an independent contractor. Where a contractor lets a portion of work to another contractor, the latter’s independence is also determined by the same criterion. It is not, however, the fact of actual interference or exercise of control by the employer, but the existence of the *349 right or authority to interfere or control, which renders -one a servant rather than an independent contractor. The employer may leave to the contractor the details of the work, but if the employer has the absolute power to control the work, the contractor is not independent. Whether the employer exercises control may be a fact to be considered in the determination of the relation of the parties — that is, the circumstance that an employer has actually exercised certain control over the performance of the work may be considered as a factor tending to show the subserviency of the contractor, and the fact that during the performance of work, the employer has exercised, no control may be considered as tending to show that he has no right to control. In weighing the control exercised, however, authoritative control must be carefully distinguished from mere suggestion as to detail . or necessary cooperation, as where work furnished is part of a larger undertaking.” (Emphasis added)
Again on page 501: “The power of" an employer to terminate a contract at any time, irrespective of whether there is or is not a good cause for so doing, is indisputably an evidential element which tends strongly to show that the person employed is not an independent contractor. * *
The facts in this case are that Jenkins either owned the truck involved in the accident alone or owned it with a man named A. H. King. His testimony on this point is vague, indefinite and beyond understanding. However, it shows that he was employed to haul the products of the Magnolia Sand and Gravel Co., viz., sand, gravel or clay, from its pits, of which it is shown that they had at least two, one near Weiss, La. and the- other near Clinton, La., and was paid so much a yard for their hauling. It is shown that the capacity of the bodies on the trucks was five yards. There were' many trucks and drivers employed by this gravel company to do its hauling. Sometimes the trucks were driven by the owners, or sometimes driven by an employee paid by the owner. As we understand the testimony, anyone owning such a truck could apply for such work with-the Magnolia Sand & Gravel- Company, and they merely asked him who to' pay. In the present case, there is some testimony that one A¡ H. King was part owner with Jenkins, and it is shown that the gravel company merely took Jenkins’ word that payments for the hauling were to be made to him. If Jenkins had told them to make the payments to King they would have done so. In other words, they did not contact the owner, and agreement was made directly with the party seeking the work.
Jenkins began hauling along with many other trucks, all on the same basis, in 1946, ■and hauled" exclusively for the Magnolia Sand & Gravel Company up until the time of the accident. Magfiolia' hired all of its hauling done by trucks owned by third parties. ■ All of the trucks which were hauling for Magnolia were given numbers and this particular truck was given the number 26. The drivers would report each morning as early as they wished and upon their arrival would sign a memorandum which was kept by Magnolia in its office as to the time of their arrival, so that those who came first could be served first. They would be told what kind of material to haul, whether gravel, sand or clay, and would report to the pit, get their trucks loaded, and would then be given -three tickets and told where to take the load. They were required to return two of these tickets signed by the purchaser and were required to return to the same pit to see if there were any other loads to haul, unless notified by Magnolia to report to a different pit, for a load, which it is shown by the record was done.
On the day of the accident, Jenkins was hauling a load to the Red Ball Company in Baton Rouge, and while en route, the superintendent of the Magnolia plant called this company and asked them to instruct Jenkins on his next trip to go to Clinton and pick up a load there.
It would seem most important to us to delve into the testimony as to what it shows the understanding to have been between the drivers and/or owner-drivers *350 of the trucks and the Magnolia Sand and Gravel Co. at the time of their employment. C. E. Safford, manager of the defendant company, testified as follows:
“Q. Do you know of your own knowledge whether or not these trucks were required to appear at the pit each morning? A. They were not required to. It was a part of the agreement that they would do hauling for us when there was any hauling to be done. If they didn’t show up, they lost earnings for that period of time.
“Q. In other words, if they didn’t show up on Monday, they just didn’t make any money? A. That is correct.
■ “Q. Do you have any information as to whether or not any of these trucks made a habit of not .showing up, or did they haul more or less regularly? A. More or less regularly. We" did have a .few who decided that there was easier money in other kinds of hauls and they would lay off a few days. In the meantime, we would have replaced them with other trucks that really wanted to work, to haul. Therefore, there was no place for them when they returned.
“Q. Mr. Safford, I want to question you a little more about some of the things that Mr. Wilson just asked you about. You said that there was no requirement as to the time a driver should take for hauling a load. Actually, if, let us say it is 3 :30 in the afternoon, you should get an order from a good customer who said he had to have a load before five o’clock and there was time, barring accidents, a blow out or something like that, for the driver to get the load at the pit and get there with it 'before five o’clock, if the driver got that load started off, wouldn’t you expect the superintendent or someone to tell him to try to get there by five o’clock, that the man wanted the load? A. Normally it would be marked on his ticket, must be delivered before a certain time or after a certain time. Occasionally we have some people', like people working in the plant, who would not be home until 4:30 and they won’t want the material delivered until after they return to their home.
“Q. So to- that extent at leas't there was some requirement as to the time of delivery? A. Well,' yes, sir, from that angle there was. Normally, however, the man left the pit and reached his destination whenever he got there.
“Q. I don’t see anything printed on these tickets, some of which were offered in evidence, about the tim'e of delivery. Would it be written on there? A. It would be written in hand across the bottom of the ticket, above the signature, must be delivered prior to or after a certain time.
“Q. If you had a lot of orders, you had a back log from the day before, and you needed every truck you could get out there as early as possible to satisfy your customers, if the men should come in when they felt like it, straggle in until noon and do that 'Continually, under those circumstances you would not tolerate that? A. No, because their position in the fleet would have been filled by somebody else who wanted to get but there and get busy.
“Q. So to that extent they were expected to report normally when loading was ready to begin? A. They were, because we had rented their truck and we wanted full capacity in action.
“Q. And you 'let them know 'that, didn’t you? A. Yes.” (Emphasis added)
It is clear to us that when a driver or owner of the truck sought employment with the gravel company the agreement was that he was to do exclusive hauling for Magnolia unless they had no hauling at a certain time; he was expected to report at least by the beginning of loading time at 6 A.M., and he was required to haul regularly and his employment or hire was on a daily basis of any kind of material manufactured by the gravel company. He was required to haul some loads late by instructions of the gravel company in order to suit the customers. He was also required to haul regardless of the weather, and he understood when he was employed that Magnolia reserved to itself the right to require all of the above of the driver under penalty of termination of the employment. In other words, Magnolia Sand and Gravel *351 Company would have the right, and it was so understood by the driver of the truck, to exercise control and supervision in many respects, to such an extent that the relationship of employer-employee resulted rather than that of an independent contractor. This contract was not one in which the owner or driver of the truck could haul one haul a day, none tomorrow, and return the next day.
It is true that there are some facts which, taken alone, would be indicative of an independent contractor relationship, such as the ownership of the truck by the third party, the right to fix his own route in the delivery of the material, and other points which are unimportant to mention in view of our conclusion based upon the facts stated.
Counsel for plaintiff relies strongly upon the case of Olana v. Leathers, decided by this Court and reported in 2 So. 2d page 486, which we recognize as very similar from a factual standpoint, and is good authority for our conclusion under the facts in the present case. However, we see no reason for a detailed comparison, and we are firmly of the opinon that the contract of employment in its inception between Jenkins and the gravel company was thoroughly understood by both, and that the company retained and had the right to direct, supervise and control the manner and method in which Jenkins was to perform the hauling; and had the right to terminate it and his employment for any violation of their instructions or understanding. Under these circumstances, the doctrine of independent contractor has no application. Jenkins was an employee of the Magnolia Sand & Gravel Co. See Burt v. Davis-Wood Lbr. Co., 157 La. 111, 102 So. 87.
As to the question of damages, the defendants do not question the amount awarded plaintiff. The matter is brought up by the answer of plaintiff to the appeal of defendants-appellants. Defendants now contend that the amount cannot be increased in that the judgment rendered in plaintiff’s favor was against the appellants and Jenkins in solido; Jenkins has not appealed nor has plaintiff appealed against Jenkins. Therefore the question of increasing the award is not presented to this court. Defendants-appellants have not cited any authorities for its contention nor have they, in argument or brief, given any reasons for so contending. We do not find any merits to their contention. By their appeal and by plaintiff’s answer to the appeal, the whole case is before us in so far as plaintiffs and defendants-appellants are concerned. For the purpose of this appeal, defendant Jenkins, as to liability and amount, has passed out of the case. Defendants-appellants, by their own actions, have placed themselves in the position in which they find themselves. They cannot now foreclose plaintiff of any rights given to her by our law, that is the right to answer their appeal and pray for an increase in the award.
The testimony shows that the plaintiff entered the Lady of the Lake Sanitarium on May 7, 1948 as the result of injuries sustained in the automobile accident, and remained there until she was discharged on May 18. She sustained the following damages and injuries:
Damages to automobile, $71.73; ambulance service, $10.00; hospitalization at Our Lady of the Lake Sanitarium, $71.35; Dr. Lester J. Williams, X-rays, $10.00; Dr. W. G. Browning, Dental work; $247.00; Dr. John T. Lewis, Medical service, $49.00; Loss of earnings from May 7, 1948 to August 15, 1948, $600.00. Total, $1,059.08.
The injuries sustained were as follows: General contusions, brush burns of hands, elbows, knees, ankles, contusion of the left chest, left shoulder, fracture of the tenth left rib, contusion of the abdomen, relaxation tissues left femoral region, left femoral hernia, and damages to the teeth which caused her to lose five of her natural teeth, one being completely broken off and four more being badly damaged, which required extraction.
For the physical pain, suffering and injuries the trial judge allowed $3000. We are of the opinion that, considering the *352 present value of the dollar, this award is inadequate by the sum of $1000, and the judgment will be so amended só as to increase the said judgment in so far as defendants-appellants are concerned.
For these reasons, the judgment appealed from is amended by increasing the amount in favor of plaintiff and against the defendants-appellants, James W. Carruth, d/b/a Magnolia Sand & Gravel Company, and Standard Accident Insurance Company, in solido, from the sum of $4,058.08 to the sum of $5,058.08, and as thus amended the judgment appealed from is affirmed.